UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PARAMJIT SINGH DHALIWAL,<br><br>    Petitioner,<br><br>    v.<br><br>KENNETH QUINN,<br><br>    Respondent. | Case No. 06-0211-RSL-JPD<br><br>ORDER REGARDING MIXED<br>28 U.S.C. § 2254 PETITION |

## I. INTRODUCTION AND SUMMARY CONCLUSION

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial. A fair trial cannot exist, and the Sixth Amendment's promise becomes empty rhetoric, without reasonably effective assistance of counsel. Accordingly, the Constitution demands undivided respect for the duty of loyalty and the duty to avoid conflicts of interest—"perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984). The numerous conflicts of a former defense counsel in the present case challenge these fundamental duties. This matter comes before the Court on petitioner's 28 U.S.C. § 2254 petition for writ of habeas corpus. Respondent has filed an answer opposing the petition, to which petitioner has replied. After additional discovery, motions for summary judgment were filed by both parties. After careful consideration of the petition, motions, briefs, governing law, and the balance of the record, the Court FINDS that petitioner has presented a mixed petition and ORDERS that he select the method of proceeding in this case, as detailed

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 1

below.

## II.   FACTS AND PROCEDURAL HISTORY

In December 1999, petitioner Paramjit Singh Dhaliwal found himself at the center of an intense and violent struggle among the taxicab drivers of the Farwest Cab Company ("Farwest"). Petitioner is a member of the Sikh religious community from Punjab, India. He was also a supporter of the Sikh traditionalist party and Farwest's 1999 Board of Directors ("1999 Board"). Until the events in question, he was employed by Farwest as a taxicab driver and was a member of Farwest's grievance committee. Based in part on the recommendation of that committee, the 1999 Board instituted a variety of controversial employment decisions and other changes at Farwest that caused a deep division between certain employees who supported the 1999 Board and certain others who supported Farwest's prior leadership.

On the morning of December 28, 1999, petitioner and another driver, Harbhajan Singh, allegedly assaulted a fellow Farwest employee who opposed the 1999 Board. Later that day, Jasbir Bassi and several other Farwest drivers opposed to the 1999 Board met to discuss how to respond to the incident. During this meeting, the group noticed petitioner drive by in his cab. They gave chase in an unmarked car, following petitioner to the Westin Hotel in Downtown Seattle, where he dropped off his fare. When petitioner realized he was being followed, he telephoned several of his friends, including Gurinder Grewal, who was waiting at the Westin Hotel in his cab when petitioner's and Bassi's cars arrived. Shortly after pulling away from the Westin Hotel, petitioner stopped at a red light. Bassi then got out of the unmarked car, approached petitioner, and began screaming and banging on petitioner's cab. In response, petitioner rolled down his window and shot Bassi with a gun he had purchased the previous day. Bassi was unarmed. He returned to his car and said "I've been shot. He shot

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 2

me. Call 911. Call the police." Dkt. No. 13, Ex. 3 at 3.[1]  At that moment, petitioner got out of his cab and fired several more shots toward the tires of the unmarked vehicle or at Bassi and the other men.   Bassi died from his wounds two days later.

Both petitioner and Grewal fled the scene.  Grewal was quickly detained, however, and gave the police a statement in which he claimed that petitioner had received death threats and that the men following petitioner had been armed.  Petitioner remained a fugitive for several months before turning himself in.   He was released on bail pending trial.  Upon release, he moved into the home of his friend, Gurinder Grewal.  At some point during or after this stay, their friendship deteriorated.  At trial, Grewal testified for the State, and recanted the statements he had made to police on the day of the shooting.  *See* 2/5/01 R. at 7-15, 63, 68, 98-99.

Petitioner was charged in King County Superior Court with the first degree murder and carrying a concealed weapon. Dkt. No. 13, at 4-5.  Petitioner argued that he had acted in self-defense because he feared for his life when confronted by Bassi.  At the time of petitioner's murder trial, petitioner's defense counsel, Antonio Salazar, was concurrently representing no fewer than *eight* witnesses in other matters:  Gurinder Grewal, Dhanoa Mohinder, Gurcharan Saidpur (a/k/a Gurcharan Singh Dhaliwal), Harbans Sidhu, Harbhajan Singh, Harinderbir Singh, Mohinder Singh, and Resham Singh.[2]   At petitioner's trial, Gurinder Grewal testified for the prosecution, while the remaining seven witnesses testified for the defense.

At the time of petitioner's trial, Salazar was simultaneously representing at least three such witnesses—but notably, *not* petitioner—in a wrongful death suit filed by the Bassi

---

[1] Docket No. 13 comprises the relevant state court record.  For materials taken from the state trial proceedings, the Court will cite the pertinent date, followed by the corresponding transcript page of the record ("R.").

[2] For a detailed summary of Salazar's concurrent representation, *see* Dkt. No. 32, *Cassandra Stamm Dec.* at 3-12, and Dkt. No. 13, Ex. 12, app. B.

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 3

family as a result of the shooting. *See Estate of Bassi, et al. v. Dhaliwal, et al.*, King County Sup. Ct., Case No. 00-2-06554-0-SEA.[3] Indeed, petitioner's eventual criminal conviction was used by Salazar in his motion for summary judgment in that case.[4] He was also simultaneously representing several trial witnesses in a shareholder action against Farwest, who were contesting their termination and/or discipline by the 2000 Board of Directors. *See Sidhu, et al. v. Seattle Farwest Serv. Corp., et al.*, King County Sup. Ct., Case No. 00-2-19279-7-SEA.[5] Salazar had also previously represented Grewal, a key prosecution witness, in a criminal matter for which petitioner was also charged,[6] and continues to represent Grewal's construction and investment companies. Dkt. No. 32, *Grewal Dep.* at 6-9. In fact, according to Grewal, Salazar is currently representing Grewal's investment company, Pacific Homes, in a pending civil case in state court. *Id.* at 8. Because the conflict regarding Grewal

---

[3] This included Harinderbir Singh, Harbhajan Singh, and Gurchuran Singh Saidpur. *See Estate of Jasbir Bassi, et al. v. Paramjit Dhaliwal, et al.*, King County Sup. Ct., Case No. 00-2-06554-0-SEA; Dkt. No. 32, *Harbinger Singh Dec.* ¶ 4.

[4] The state court record in this case confirms that shortly after petitioner was convicted of first degree murder, Salazar filed a motion for summary judgment on behalf of the above-mentioned clients. Dkt. No. 13, Ex. 10, at 12-13; *Cassandra Stamm Dec.* ¶ 14, app. F(1) at 4, F(5)-(10). That summary judgment brief stated, in part, as follows: "Defendant Paramjit Dhaliwal shot and killed the decedent on December 28, 1999. A jury convicted Mr. Dhaliwal of first degree murder." *Id.* app. F(7) at 2. Specifically, the brief and supporting materials argued that Salazar's other clients could not be held civilly liable because they were not aware that petitioner possessed a gun and had no reason to believe that petitioner would kill Bassi when Bassi attempted to stop and talk to petitioner on December 28, 1999. *Id.* app. F(1) at 4, app. F(11); *see also* Dkt. No. 32, *Affidavit of Harbinger Singh in Support of Motion for Summary Judgment* at 2-4.

[5] Specifically, defense counsel represented Gurcharan Saidpur, Harbhajan Singh, Harbans Sidhu, Mohinder Singh, and Resham Singh in the civil suit against Farwest. Dkt. No. 13, Ex. 3 at 4; Ex. 15 at 56; *see also id.* Ex. 12, app. B.

[6] Petitioner's defense counsel had previously represented Harbhajan Singh and Gurinder Grewal in a felony assault case in which petitioner was a codefendant. *See State v. Singh, et al.*, King County Sup. Ct., Case Nos. 98-1-09253-6-SEA, 98-1-09252-8-SEA, and 98-1-09251-0-SEA. All charges were eventually dropped. Dkt. No. 13, Ex. 3 at 4.

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 4

was apparent to Salazar, he had his co-counsel, Armando Cobos, perform the cross-examination of Grewal at petitioner's trial. Washington State Bar Records indicate that Mr. Cobos has since lost his license to practice law, due to conflict-of-interest problems, among other ethical violations.[7]

Prior to trial, the prosecutor moved the court to determine whether a conflict of interest existed regarding defense counsel's representation of certain of the above-mentioned witnesses. Dkt. No. 13, Ex. 8 at 5; Ex 15 at 57-59. While doing so, the prosecutor noted, for example, that "the shareholder lawsuit . . . directly relates to the conflict between the two factions within the company that in many respects is at the heart of the motive behind the shooting in the case." Dkt. No. 13, Ex. 15 at 58. No mention was made of the wrongful death case. The trial court conducted a very brief inquiry into the potential conflicts, but ultimately accepted defense counsel's representation that there were none. Dkt. No. 13, Ex. 8 at 5; Ex 15 at 58. The court explained the issue to petitioner and accepted his statement that he wanted to continue representation with the same lawyer. Dkt. No. 13, Ex. 8 at 5; Ex 15 at 58. At no point did petitioner object to representation by defense counsel.

On February 15, 2001, a jury found petitioner guilty of first degree murder with a firearm enhancement. Dkt. No. 13, Ex. 2. On March 30, 2001, he was sentenced to 300 months. Dkt. No. 13, Ex. 1. Petitioner is presently incarcerated at the Monroe Correctional Complex in Monroe, Washington, pursuant to that conviction. Dkt. No. 1.

A.  Direct Review

Proceeding through counsel, petitioner appealed his conviction to Division I of the Washington Court of Appeals ("Court of Appeals"). Dkt. No. 13, Ex. 2. While petitioner

---

[7] *See Discipline Notice*, WASHINGTON STATE BAR ASS'N, Jan. 12, 2004, *available at* http://pro.wsba.org/PublicView-Discipline.asp?Usr_Discipline_ID=591. This disciplinary report constitutes a public record of a state agency, the facts of which this Court may take judicial notice. Fed. R. Evid. 201; *see also Wilbur v. Locke*, 423 F.3d 1101, 1112 (9th Cir. 2005).

made three separate arguments on appeal,[8] his primary argument was that his Sixth Amendment right to a conflict-free attorney was violated when the trial judge failed to adequately inquire into his attorney's potential conflicts of interest, including, but not limited to, the prior and concurrent representation of critical witnesses for both the defense and the prosecution. On September 3, 2002, the Court of Appeals published a decision affirming the conviction. *State v. Dhaliwal*, 113 Wn.App. 226, 242, 53 P.3d 65 (2002). Although the Court of Appeals agreed that the trial judge failed to conduct an adequate conflict-of-interest inquiry, it found that petitioner had failed to show that the putative conflicts adversely affected his attorney's performance. Accordingly, the court determined that petitioner was not entitled to a new trial, and upheld his conviction. *Id.* at 67. Petitioner subsequently moved for reconsideration, which was denied by the Court of Appeals on October 10, 2002. Dkt. No. 13, Ex. 4, 5.

On December 3, 2002, petitioner filed a petition for review in the Washington Supreme Court. Dkt. No. 13, Ex. 6. The Washington Supreme Court granted the petition for review and on November 20, 2003, issued an en banc published decision affirming petitioner's conviction. *State v. Dhaliwal*, 150 Wn.2d 559, 581, 79 P.3d 432 (2003) (en banc). The Washington Supreme Court issued its mandate on December 10, 2003. Dkt. No. 13, Ex. 9.

B.   Collateral Review

On November 3, 2004, petitioner filed a personal restraint petition ("PRP") with the Court of Appeals. Dkt. No. 13, Ex. 10. The Court of Appeals, however, dismissed the PRP. Dkt. No. 13, Ex. 11. Petitioner challenged the dismissal by filing a motion for discretionary review with the Washington Supreme Court, but on January 27, 2006, the Supreme Court Commissioner issued a ruling denying review. Dkt. No. 13, Exs. 12, 13. On February 13,

---

[8] This included two ineffective assistance of counsel claims and a claim of prosecutorial misconduct.

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 6

2006, petitioner filed the present 28 U.S.C. § 2254 petition for writ of habeas corpus. Dkt. No. 1. On May 17, 2006, respondent filed an answer to the petition, Dkt. No. 10, to which petitioner replied on July 10, 2006. Dkt. No. 15. Due to the voluminous facts in this case and difficulties obtaining discovery, the Court granted the parties' motions to extend the discovery period and dispositive motions deadline. Dkt. Nos. 24, 27, 35. Petitioner's § 2254 petition, the parties' dispositive motions, and the complete record in this case are now before the Court.

## III. ISSUES PRESENTED

Petitioner's § 2254 petition raises three grounds for relief:

1. Defense counsel's fee arrangement, and past and concurrent representation of certain witnesses created conflicts of interest that violated petitioner's Sixth Amendment right to effective assistance of counsel;

2. Defense counsel's failure to call certain witnesses, effectively cross-examine witnesses, and conduct a thorough pretrial investigation violated petitioner's Sixth Amendment right to effective assistance of counsel; and

3. The prosecuting attorney's closing statements regarding the Sikh community's alleged violent tendencies amounted to prosecutorial misconduct that violated petitioner's right to a fair trial under the Fifth and Sixth Amendments.

## IV. DISCUSSION

A. <u>Overview of Defense Counsel's Conflicts of Interest</u>

Petitioner's trial and the record on direct and collateral appeal failed to unearth all of Salazar's conflicts of interest. The petitioner sought an evidentiary hearing on multiple occasions throughout the state-court litigation, but those requests were denied. Since that time, this Court has granted the parties additional discovery and, as a result, Salazar's numerous conflicts of interest have been exposed. Although the parties dispute whether those conflicts adversely affected counsel's performance or prejudiced petitioner's defense, it is largely undisputed that massive conflicts hovered over the state court litigation. Further discovery permitted by this Court has revealed additional evidence regarding those conflicts

01  that was not presented to, and/or not considered by, the Washington Court of Appeals or
02  Washington Supreme Court. The discovery produced in this habeas proceeding can be
03  summarized in part as follows:

04          1.    *Financial Conflicts, Conflicted Pretrial Investigation*

05      Salazar took petitioner's case on a flat fee basis. The evidence of record reveals no
06  discussion of a fee arrangement with petitioner. Instead, it appears that Saidpur paid Salazar
07  to represent petitioner, using monies collected from petitioner's friends. Dkt. No. 32, *G.*
08  *Dhaliwal Dec.* ¶ 6-8. "One of the biggest contributors was Gurinder Grewal." *Id.* at ¶ 6
09  ("Antonio Salazar knew that some of the money came from Gurinder Grewal because I told
10  him this."); *see also* Dkt. No. 32, *Kashmir Singh Sanduhu Dec.* ¶ 11. This financial
11  arrangement may have severely impaired petitioner's defense in several respects. It appears,
12  for example, that Salazar made sure not to incur costs when preparing petitioner's case for
13  trial, because any out-of-pocket costs would have reduced the ultimate fee he would receive.
14  Here, petitioner points to a grand total of $14.18 in costs incurred for a first-degree murder
15  trial, Dkt. No. 32, *Salazar Dep.* I, Ex. 5, possible only because Salazar failed to hire an
16  investigator, interpreter, or an assistant to locate witnesses and evidence relevant to
17  petitioner's defense. Without an independent investigator, Salazar failed to recognize the need
18  to call or, if briefly called, thoroughly examine, several witnesses at trial, including at least five
19  persons who were poised to provide—based on their post-trial declarations—evidence
20  extremely favorable to petitioner's defense: Bhupinder Dhillon, Kashmir Singh Sanduhu,
21  Harbans Singh Sidhu, Harbinger Singh, and Mohinder Singh. *See, e.g.*, Dkt. No. 32,
22  *Bhupinder Dhillon Dec.* at 1-2; *Kashmir Singh Sanduhu Dec.* at 1-4; *Harbinger Singh Dec.* at
23  1-4; *Mohinder Singh Dec.* at 1-2; *Cassandra Stamm Dec.* at 8-9.[9] Salazar's recent deposition

24

---

25
26     [9] Three of these witnesses—Harbans Sidhu, Harbinger Singh, and Mohinder Singh—were clients of Salazar.

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 8

reveals that he has almost no memory of who he interviewed while preparing petitioner's defense.

### 2. *Gurinder Grewal*

Salazar's connection to Gurinder Grewal presented a more substantial conflict of interest in petitioner's case. Grewal is not only a current client of Salazar's, but was also represented by Salazar in a 1998 criminal assault case, the facts of which were exploited by the prosecution to undercut petitioner's evidence of self-defense. When Salazar was initially contacted regarding the present case, it was not to represent petitioner, but rather Grewal, who was the person originally arrested for the shooting after he was seen fleeing the scene. *See* Dkt. No. 32, *G. Dhaliwal Dec.* ¶ 3; 2/5/01 R. at 8.

At trial, Grewal contradicted nearly all his previous statements regarding the shooting as well as the conflicts leading thereto. Specifically, Grewal recanted the statement that he had made to police on the day of the shooting, and instead testified that petitioner "wanted to shoot Mr. Bassi in his head," had planned Bassi's killing, boasted about it afterward, and had pressured Grewal to lie to support his claim of self-defense. 2/5/01 R. at 7-30. When it came time to cross-examine Grewal's testimony, Salazar's loyalties were conflicted. To resolve this conflict, Salazar asked his co-counsel, Armando Cobos, to perform the cross.

During his recent deposition, Salazar first stated that he did not represent Grewal after 1999. *See* Dkt. No. 32, *Salazar Dep.* I at 37. However, the record reflects that Salazar represented Grewal in the shareholder litigation that was filed in 2000. *See id.* at 37-40, Ex. 19. After acknowledging this fact, Salazar stated that he had not represented Grewal on any other matters. *See id.* at 41. This, too, is likely false, as Grewal has recently explained that Salazar is presently representing one his investment companies in a civil suit that has been pending since 2006. *See* Dkt. No. 32, *Grewal Dep.* at 6-8.

Salazar failed to disclose to the trial court his past and current affiliations with Grewal.

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 9

Furthermore, although both Salazar and the Washington Court of Appeals acknowledged Grewal's status as a "key" and "important" witness in petitioner's murder trial, Dkt. No. 32, *Salazar Dep.* I at 43; *Dhaliwal*, 113 Wn.App. at 229, Salazar neglected to interview Grewal. Salazar testified that such an interview was unnecessary because he believed he knew the reason for Grewal's change in testimony, i.e., a letter that petitioner had written and disseminated throughout the Sikh community which included a claim of infidelity as to Grewal's wife. Dkt. No. 32, *Salazar Dep.* I at 42-44. However, if Salazar would have interviewed Grewal, he would have learned that Grewal had little or no knowledge of this information. At trial, Grewal denied receiving or having knowledge of this correspondence, denied being upset or ashamed by this putative allegation, and gave confusing testimony regarding any alleged threats made by petitioner. *See* 2/5/01 R. at 81-85, 103-06. In fact, Grewal recently stated that petitioner always treated his wife "as a sister." Dkt. No. 32, *Grewal Dep.* at 42-43.

Salazar has acknowledged that, because of this conflict of interest, he had Mr. Cobos cross-examine Grewal, although Salazar helped "prepare him" for that examination. Dkt. No. 32, *Salazar Dep.* I at 45. This would, in Salazar's words, help make a "clean record," because Mr. Cobos "had never previously represented Mr. Grewal." *Id.* at 45-46. However, the record suggests the opposite might be true—i.e., that Cobos *did* represent Grewal during prior proceedings. *Id.* Ex. 21.[10]   Regardless, while the parties agree that the cross-examination of Grewal spanned many pages, petitioner argues that it was deficient in many respects.

        3.    *Fred Leatherman*

An equally significant conflict came by way of Fred Leatherman, a person whose role in this case appears to have been neither addressed nor considered by the Washington Court of

---

[10] During cross-examination regarding the 1998 criminal assault case, Grewal told Mr. Cobos, and thus the jury, that "*your office* represented me." 2/5/01 R. at 89 (emphasis added).

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 10

01   Appeals or Washington Supreme Court.  Mr. Leatherman was retained as counsel for
02   petitioner in early 2000.  In the weeks that followed, Mr. Leatherman "met with and
03   interviewed many witnesses to the shooting, the conflicts that preceded it, and its aftermath."
04   Dkt. No. 32, *Leatherman Dec.* ¶ 5.  On February 4, 2000, he wrote the detective on the case
05   regarding the results of his investigation.  Dkt. No. 32, *Leatherman Letter to Detective*
06   *Ramirez* at 1-6 (Feb. 4, 2000).  Attached to the letter were no less than nine declarations from
07   witnesses, associates, and/or acquaintances of the pertinent players in petitioner's case.  *See id.*
08   app.[11]  In late March 2000, Saidpur arranged for a meeting in downtown Seattle between
09   Leatherman and petitioner (still a fugitive) for the purpose of turning petitioner in to the
10   authorities.  Dkt. No. 32, *Leatherman Dec.* ¶ 6.
11       In September 2000, Leatherman learned that many of the witnesses he had previously
12   interviewed were now claiming that their interview statements were not truthful.  *Id.* ¶ 7.
13   Leatherman withdrew as counsel on September 17, 2000, once it became obvious that he was
14   a necessary impeachment witness in this regard.  *Id.*  He kept in contact with Salazar, and had
15   "the understanding that [he] would be called as a witness for the defense," and that "Mr.
16   Salazar would call [him] when [his] testimony was needed."  *Id.* ¶¶ 8-9.  Indeed, a letter faxed
17   from Salazar to Leatherman on February 6, 2001, clearly indicates Salazar's anticipation that
18   Leatherman would be called at trial.  Dkt. No. 32, *Salazar Letter to Leatherman* at 1-3 (Feb.

---

[11] Taken together, the declarations echo a consistent story:  (1) death threats regarding petitioner, made by Rajpal Singh Padda to Harbhajan Singh on December 19, 1999 at the Sikh Temple in Renton, Washington; (2) a fairly detailed plot to assault and/or kill petitioner; (3) a meeting on the day in question by the Bassi faction at The Pizza Shop on Pacific Highway, witnessed by Karanbir Singh, who saw a white plastic bag held by Padda with two guns, one of which he passed to Bassi before they left the restaurant; (4) entry into an unmarked white car by Bassi, Padda, and two other men (Padda driving), followed by Virk in a STITA taxicab (presumably as a backup car if things went awry); (5) finding petitioner's cab at the airport and following him to downtown Seattle; (6) petitioner's frantic cell phone calls to certain of his friends once he discovered he was being followed; and (7) later hearing of Bassi's death.  *Leatherman Letter to Detective Ramirez*, app. (Feb. 4, 2000).

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 11

6, 2001) (noting numerous questions Salazar had for Leatherman in advance of his testimony). However, Salazar never called Leatherman to testify. Dkt. No. 32, *Leatherman Dec.* ¶ ("To this day, I do not know why he decided not to call me.").

Petitioner contends that Salazar's decision was tied to one of his numerous conflicts in this case: his concurrent representation of Gurchuran Saidpur. Despite Leatherman's understanding that the Dhaliwal–Leatherman meeting was arranged by Saidpur, when questioned at trial, Saidpur denied any contact with petitioner over this time. 2/6/01 R. at 217-18. Saidpur's earlier declaration reveals that this testimony was completely fabricated. *See* Dkt. No. 32, *G. Dhaliwal Dec.* ¶ 7. Moreover, according to Saidpur's statements, Salazar explained that he would not be able to call Leatherman as a witness in petitioner's criminal trial because it was likely that Leatherman would implicate Saidpur in a crime. *Id.* ¶ 8. By so deciding, Salazar arguably put Saidpur's legal interests above petitioner's.

Salazar's decision not to call Leatherman quite possibly undermined petitioner's defense at trial. Had Leatherman been called to testify, he could have impeached the testimony of several witnesses, including Grewal, Salazar's prior, concurrent, and present client. *See* Dkt. No 32, *Leatherman Dec.* ¶¶ 11-21. Specifically, Leatherman could have controverted Grewal's statements at trial that: (1) the comments he initially provided to police officers supporting petitioner's self-defense were lies; (2) that he had been threatened by petitioner to make certain statements; (3) that petitioner had never been threatened by Bassi and/or his faction; (4) that he had not seen Bassi run to petitioner's cab or try to open his door; (5) that he had not heard Padda yell to Bassi "not to let him [petitioner] go"; and (6) that he had heard petitioner express a desire to shoot Bassi. *Id.*

Leatherman, if called as a witness, would have similarly impeached the surprising trial testimony of prosecution witness Vikramjeet Virk, one of the men in the Bassi cab on the day of the shooting. *See Dhaliwal*, 113 Wn.App. at 230. Leatherman could have done so based on an interview he conducted with Virk in February 2000, wherein Virk expressed his fear of

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 12

being charged with a crime and being retaliated against by the Bassi faction, which prompted his questions to Leatherman regarding the possible legal consequences if he were to, at trial, recant the statements he had initially made to police officers around the time of the shooting. Dkt. No. 32, *Leatherman Dec.* at 10-14. Leatherman refused to answer Virk's question, reminding Virk that he was *petitioner's* counsel, and was ethically prohibited from giving legal advice to potential witnesses in the case. *Id.* at 12-13, ¶¶ 30-31. Initially, Leatherman was so convinced that Virk would provide exculpatory evidence that he sought and obtained a material witness warrant for Virk's arrest upon learning that he was planning to travel to India until the end of the trial. *Id.* at 13, ¶ 32.

Salazar demonstrated a profound lack of knowledge or indifference regarding Fred Leatherman's importance to petitioner's defense. This was recently reflected in Salazar's deposition, during which Salazar explained that he (1) had no memory that Leatherman withdrew from the case because of a conflict of interest; (2) could not recall whether he had any substantive conversations with Leatherman while investigating petitioner's case; and (3) provided no explanation for his failure to call Leatherman as a defense witness at petitioner's trial, other than the conclusory opinion that Leatherman "would not be a helpful witness." *See* Dkt. No. 32, *Salazar Dep.* I at 31-33, 72-76, 119. The prosecution emphasized the absence of Leatherman in its closing argument:

> Where is Fred Leatherman? Doesn't it really beg the question: Where is Fred Leatherman? Mr. Salazar got up and argued what the evidence supported was the contention that Mr. Virk provided this information to Harbhajan Singh and Mr. Dhillon and went down to Mr. Leatherman's office and provided the exact same evidence to Mr. Leatherman. Presumably Mr. Leatherman would be an independent witness. He's a lawyer here in town. Where is he to corroborate that? He's not here. Is it credible? I would submit not.

2/13/02 R. at 122-23.

####    4.   *Conflicts Regarding State Witnesses*

Not only did Salazar fail to interview witnesses critical to petitioner's defense, he neglected to interview a single witness called by the prosecution, despite the fact that defense

counsel is permitted to do so under Washington law.[12]  Salazar has acknowledged as much. *See, e.g.*, Dkt. No. 32, *Salazar Dep.* I at 43; *Salazar Dep.* II at 177-80.  It is also undisputed that Salazar decided not to interview any witness belonging to or friendly with the Bassi faction because he believed that all such witnesses would lie.  *See id.*, *Salazar Dep.* I at 116-17; *Salazar Dep.* II at 150-52 ("My experience was that they [the Bassi faction] would say anything[,] whether it was the truth or not.").

Petitioner insists it is patently unreasonable to fail to interview important prosecution witnesses, stressing that no competent, non-conflicted attorney would have failed in this regard.  According to petitioner, it was necessary to interview such witnesses to determine what type of evidence he would need to expect and/or submit at trial.  In this regard, petitioner argues that Salazar should have, if nothing more, interviewed these witnesses in an attempt to obtain important impeachment evidence, and that Salazar's choice not to do so cannot be viewed as "tactical" because absolutely no effort was made to procure the information necessary to make such a decision.  Indeed, it is possible that Salazar made these "non-decisions" due to his own personal biases, created by the numerous conflicts of interest stemming from his past and current representation of persons embroiled in legal disputes with Farwest and the Bassi family.  *See id.*, *Salazar Dep.* II at 151-52 (agreeing that his decision not to interview these witnesses was based, at least in part, on his "disputes over the years with these two factions"—specifically, his "legal assistance in the civil and criminal matters").

B.   Additional Discovery Has Rendered Petitioner's Ineffective Assistance of Counsel Claims Unexhausted

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No.

---

[12] Under Washington law, defense counsel is permitted to interview all State witnesses before they testify at trial.  If a witness refuses to cooperate, the court may order that a pretrial deposition take place.  *See* Wash. CrR 4.6(a) (West 2006); *State v. Gonzalez*, 110 Wn.2d 738, 745, 757 P.2d 925, 929 (1988).

104-132, 110 Stat. 1214 (1996), governs habeas petitions filed by prisoners who were convicted in state courts. 28 U.S.C. § 2254. In order for a federal district court to review the merits of a § 2254 petition, the petitioner must first exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A); *Fields v. Waddington*, 401 F.3d 1018, 1020 (9th Cir. 2005). The purpose of the exhaustion doctrine is to preserve federal-state comity which, in this setting, provides state courts the initial opportunity to correct violations of its prisoners' federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Ex parte Royall*, 117 U.S. 241, 251 (1886). "The § 2254(b) exhaustion requirement means that petitioners must present to the state court both the facts necessary to state a claim for relief and the federal legal theory on which that claim is based." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996)). A petitioner can satisfy the exhaustion requirement by either (1) fairly and fully presenting each of his federal claims to the highest state court from which a decision can be rendered, or (2) demonstrating that no state remedies are available to him. *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996). A petitioner fairly and fully presents a claim if he submits it "(1) to the proper forum, (2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005) (internal citations omitted).

When new facts present new claims or significantly augment old ones, federal courts should carefully consider whether those claims are unexhausted so as not to trample on the state courts' initial opportunity to pass upon merits of those claims. *See Aiken v. Spalding*, 841 F.2d 881, 884 n.3 (9th Cir. 1988) (per curiam) ("'[Where] a federal habeas petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence.'") (quoting *Dispensa v. Lynaugh*, 826 F.2d 375 (5th Cir. 1987)). Comity demands

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 15

this much.

A federal claim is unexhausted if it contains new factual allegations which "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). In addition, new evidence may also violate the "fair presentation" requirement and render a claim unexhausted if it "substantially improves the evidentiary basis" for the claim it supports. *Aiken*, 841 F.2d 883. New factual allegations that are merely cumulative of those previously presented to the state court, however, do not require exhaustion. *Hillery v. Pulley*, 533 F. Supp. 1189, 1200-02 (E.D. Cal. 1982), *aff'd*, 733 F.2d 644 (9th Cir. 1984), *aff'd*, 474 U.S. 254 (1986).

Here, petitioner's additional discovery has yielded new conflicts of interest while also adding to the evidentiary basis underlying the original conflicts alleged in state court. Specifically, the Court points to the above-mentioned evidence relating to Fred Leatherman, representation of Gurinder Grewal's business, the third-party fee arrangement, the additional capacities in which Salazar represented trial witnesses, and the additional information regarding Salazar's representation of every plaintiff *but* petitioner in the wrongful death suit. Furthermore, Salazar's recent deposition makes it clear that several of his trial decisions (or non-decisions) were based, at least in part, on conflicting loyalties created by the numerous conflicts of interest stemming from his past and concurrent representation of persons involved in legal disputes with Farwest and the Bassi Family. *See, e.g.*, Dkt. No. 32, *Salazar Dep.* II at 151-52.

Although petitioner's ineffective assistance of counsel claims have essentially remained the same, the evidentiary basis for those claims has changed significantly. *Cf. Beaty v. Stewart*, 303 F.3d 975, 989-90 (9th Cir. 2002) (holding that conflict-of-interest claim was unexhausted where petitioner presented facts that supported a different incident of conflict in his habeas petition). This is the very type of evidence which the state courts should consider in the first

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 16

instance.[13] In sum, the additional facts place petitioner's conflict-based ineffective assistance of counsel claim in a significantly different and stronger evidentiary posture than that presented in state court over two years ago. Accordingly, this claim is unexhausted. *See Aiken*, 841 F.2d at 884 & n.3. Furthermore, because petitioner's second ineffective assistance claim—that of deficient performance—stems directly from Salazar's alleged conflicts of interest, it, too, has not been fully exhausted.

### C. Petitioner Has Presented a Mixed Petition

Petitioner's prosecutorial misconduct claim has been properly exhausted. However, his ineffective assistance of counsel claims have not. Petitioner's current habeas corpus petition is therefore "mixed." *Rose v. Lundy*, 455 U.S. 509, 522 (1982). In this situation, the Court may dismiss all or part of the petition without prejudice. *Jefferson v. Budge*, 419 F.3d 1013, 1016-17 (9th Cir. 2005). This remedy presents a dilemma for the petitioner, however, because his petition will likely be time-barred under AEDPA by the time he accepts dismissal, exhausts his unexhausted claims in state court, and returns to federal court to file a second habeas action. *See, e.g.*, *Ford v. Hubbard*, 330 F.3d 1086, 1098 (9th Cir. 2003).

However, the petitioner can avoid dismissal. Prior to dismissing a mixed petition, this Court must provide petitioner with the opportunity to (1) amend his petition to proceed only with his exhausted claims, (2) withdraw the entire petition and resubmit it upon exhausting his remaining claims, or (3) show good cause as to why the Court should stay the entire petition pending the exhaustion of his unexhausted claims. *Jackson v. Roe*, 425 F.3d 654, 659-60 (9th Cir. 2005); *Calderon v. United States District Court* (*Taylor*), 134 F.3d 981, 988 (9th Cir. 1998). If this Court grants a stay and holds the petition in abeyance pending the exhaustion of

---

[13] The Court of Appeals' opinion, at times, appears to express this much. *See, e.g.*, *Dhaliwal*, 113 Wn.App. at 240 n.49 (noting that petitioner's request to remand for further inquiry regarding Salazar's actual conflicts-of-interest was likely "better suited in the context of a personal restraint petition").

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 17

state remedies, petitioner may then return to federal court and amend his petition without encountering problems with the statute of limitations, *see* 28 U.S.C. § 2244(d)(1), or the prohibition on second or successive habeas filings, *id.* § 2244(b)(2). This "stay and abeyance" procedure is available only in limited circumstances in which the Court finds that petitioner had "good cause" for failing to exhaust the claims. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). The Court should not grant the stay if the claims are meritless, or if petitioner engages in "abusive litigation tactics or intentional delay." *Id.*

The petitioner has already demonstrated good cause for option three. His claims are certainly not meritless; nor does it appear that petitioner has engaged in abusive litigation tactics or intentional delay. However, petitioner must still be given the option to forgo some, all, or none of his current petition.

## V. CONCLUSION

This case is riddled with substantial and serious conflicts of interest. The Washington Court of Appeals and Washington Supreme Court held that the trial judge failed to conduct an adequate conflict-of-interest inquiry, and concluded that petitioner did not waive his Sixth Amendment right to a conflict-free attorney; however, those courts ultimately found that petitioner had failed to show that the alleged conflicts adversely affected his attorney's performance. Consequently, those courts upheld petitioner's conviction.

Additional discovery permitted by this Court may affect the state courts' final conclusion—i.e., that defense counsel's numerous conflicts of interest did not adversely affect his handling of petitioner's murder trial. These new and unexamined facts highlight the need to preserve federal-state comity in this case. Accordingly, and in the interests of justice, the Court ORDERS petitioner to select one of three options regarding his mixed § 2254 petition:

(1) Amend the petition to proceed only with his exhausted claims;

(2) Withdraw the entire petition and resubmit it upon exhausting his


remaining claims; or

(3) Request that the Court stay this case, and hold the petition in abeyance, pending the exhaustion of petitioner's unexhausted claims.[14]

Petitioner shall advise the Court of his selection no later than **June 11, 2007**. The Court further directs that a copy of this Order be sent to the Washington State Bar Association for its consideration of the appropriateness of disciplinary measures. The Clerk is also directed to send a copy of this Order to the Honorable Robert S. Lasnik, Chief Judge.

DATED this 16th day of May, 2007.

_James P. Donohue_
JAMES P. DONOHUE
United States Magistrate Judge

---

[14] Should the third option be selected and thereafter granted by this Court, the one-year limitation period imposed by AEDPA, 28 U.S.C. § 2244(d)(1), would be tolled during the pendency of petitioner's state-court proceedings. *See id.* § 2244(d)(2). The petitioner's request for an evidentiary hearing before this Court would also be held in abeyance during this period. *See Schriro v. Landrigan*, ___ U.S. ___, No. 05-1575, slip op. at 6 (May 14, 2007) (noting that under AEDPA, the decision to grant an evidentiary hearing is "left to the sound discretion of district courts").

ORDER REGARDING MIXED 28 U.S.C. § 2254 PETITION

PAGE - 19